## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PETER LARSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-3243 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Peter Larsen appeals the final decision of the Defendant Commissioner of the Social Security Administration.  The Commissioner determined that Larsen was not disabled within the meaning of the Social Security Act and denied his claim for Disability Insurance Benefits.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, this Court reverses the decision of the Commissioner and remands for further proceedings.

## <u>STATEMENT OF FACTS</u>

Larsen was born on March 7, 1954.  He completed high school and

over three years of college course work.  He worked in the past as an independent contractor providing janitorial and grounds keeping services. Larsen has a history of back and knee problems.  In 1997, his knees were swollen and painful.  He underwent arthrosporic surgery in April 1997.  His knee problem continued thereafter.

Larsen also had problems with back pain.  In February 1999, he went to see orthopedist Dr. Timothy A. VanFleet, M.D.  Dr. VanFleet ordered several studies of his lower back.  The studies revealed that Larsen had multiple annular tears at the level of L5-S1 which were causing stenosis of the nerve.  He had a grade IV-V annular tear at L4-5 along with a bulging disc that caused stenosis and concordant pain when injected.  <u>Record of Proceedings (d/e 10) (hereinafter "R.")</u>, 146-47.  In April 1999, an MRI study revealed that Larsen had a markedly degenerative disc at the L1-2 level, with annular protrusion, loss of disc height and other irregularities. <u>R.</u>, 153.

Later in 1999, Larsen reported that he reduced his work hours to 8:00 a.m. to 2:00 p.m., three days a week.  He worked until noon on the other two days.  He reduced his hours because of fatigue.  <u>R.</u>, 209.

Larsen saw another orthopedic surgeon, Dr. Michael Watson, M.D.,

about his knee problems. In early April 2000, Dr. Watson found that x-rays indicated a complete collapse of the medial compartment of the right knee with moderately advanced degenerative arthritis. Dr. Watson tried injections of Synvisc. Even so, Larsen had persistent swelling. R., 223. The swelling was made worse when Larsen tried to play basketball, when he went fishing, and when he walked up a ramp. Id. On November 16, 2000, Dr. Watson found that Larsen had severe arthritis and an unstable knee due to a ruptured anterior cruciate ligament. R., 222.

Dr. VanFleet saw Larsen again in June 2001. Additional MRI studies showed some increase in degenerative changes over the prior studies. R., 243. Dr. VanFleet recommended spinal fusion in August 2001. Dr. VanFleet said there will be a 60 percent chance of improvement with surgery, but Larsen wanted a second opinion. R., 252.

In November 2001, Dr. Watson prepared a letter stating Larsen was disabled due to Larsen's advanced osteoarthritis in his knees. Dr. Watson described Larsen's condition as permanent and progressive. R., 253. Dr. Drapiza also prepared a letter indicating she had been Larsen's primary care physician since 1998. Dr. Drapiza received reports from specialists regarding Larsen's conditions. She stated that his arthritic problems had

3

spread and become generalized which has left him almost physically incapacitated. She stated that his condition was permanent and progressive. R., 254.

In January 2002, Larsen had a consultative psychological evaluation by Dr. Stephen Vincent, Ph.D. Dr. Vincent concluded that as a result of chronic pain and loss of employability, Larsen suffered from moderate adjustment disorder with depressed mood. R., 257.

In November 2002, Dr. VanFleet prepared a summary of Larsen's physical capacities. Dr. VanFleet stated that Larsen could not sustain sedentary work on a regular and continuing basis. Dr. VanFleet stated that Larsen could lie down for two hours, sit for four hours, and stand/walk for two hours. He concluded that Larsen, at best, could perform an accommodated, part-time sedentary job. R., 298-304.

Larsen went back to see Dr. Watson for his knee in November 2002. Larsen stated that his pain was severe, and x-rays showed advanced arthritis. Dr. Watson believed Larsen needed a total knee replacement. R., 336.

Larsen's attorney sent Dr. Watson a set of written interrogatories in preparation for the hearing before the Administrative Law Judge (ALJ). Dr. Watson stated in his answers to those interrogatories that: (1) Larsen had

degenerative arthritis in both knees; (2) radiographic studies demonstrated the existence of the arthritis; (3) Larsen had persistent pain and stiffness in his right knee; (4) Larsen had clinical signs of marked limitation of motion or of abnormal motion in his right knee; (5) Larsen had gross anatomical deformity of the knees supported by radiographic or other imaging evidence of joint space narrowing, bony destruction, or ankylosis; and (6) Larsen had a limited ability to walk or stand.  Dr. Watson further stated that Larsen had severe medial joint osteoarthritis of the right knee with deformity.  He also stated that Larsen was unable to ambulate without a limp and that it was painful to walk even short distances.  R., 332.

Dr. Watson stated that x-rays and clinical evaluation, and observation outside the office setting demonstrated that Larsen's arthritis to be reasonably expected to cause an inability to effectively ambulate.  Dr. Watson stated this is a permanent condition that is likely to be progressive. Dr. Watson stated that Larsen's claims of pain were consistent with the objective medical testing and clinical findings.  Dr. Watson reviewed the Social Security Listing 1.02A for inability to ambulate due to joint disease. 20 C.F.R. Part 404 Subpart P, Appendix 1, § 1.02A.  He opined to a reasonable degree of medical certainty that Larsen had an impairment that

met the medical criteria in the Listing.  <u>R.</u>, 332-35.

Larsen then had his hearing before the ALJ on March 5, 2003.  Larsen appeared in person and by his counsel.  Larsen submitted the various statements prepared by Drs. Watson, VanFleet and Drapiza.  The ALJ objected to the doctors' statements.  The ALJ stated, concerning Dr. VanFleet's functional assessment of Larsen:

> I'm making objections to the weight to be given to this document because of the fact that I have no idea what instructions were given to the doctor.  I have no idea if any phone conversations were had with the doctor, what types of letters, instructions.  I have no idea whether the responses are based on a functional capacity examination of the Claimant.  I find the form misleading and that it doesn't say who provided it or what the basis is.  It's not a medical record prepared on the -- for the basis of treatment, according to what I can read.  I have no idea whether it was filled out with the doctor knowing the daily activities of the Claimant.  And I also don't know whether the doctor has a financial interest in the outcome of this case.  So those are my objections to the exhibit and weight will be given accordingly because of those objections.

<u>R.</u>, 362.  The ALJ objected to a letter written by Dr. Watson because, "It looks like it's a letter written to the Claimant.  I don't know who asked that doctor to write the letter to the Claimant."  <u>Id.</u>  The ALJ stated, concerning a letter from Dr. VanFleet: "I don't know for what purpose it was written.  The letters do not seem to be treating medical records.  They seem to be

advocacy letters.  So I'm not sure why those were prepared or for what reason, but they do not appear to be medical records in themselves." R., 363.  The ALJ said she had the same comment regarding the weight to be given to Dr. Watson's answers to the claimants interrogatories.  R., 364.

Larsen's counsel asked the ALJ, "So unless a doctor expresses an opinion in an actual office visit its not a medical source statement?"  The ALJ responded with respect to the interrogatories:

> I'm not saying that at all.  It's from a medical source.  I'm explaining on the record why I will weigh it accordingly.  It is not a document prepared for treatment.  It's a document prepared to what appears to be advocating for Disability Benefits.  I have no idea why the doctor prepared it because I have been given no documents from the representative that explains whether it was prepared for the Hearing to help get Disability Benefits, whether it was prepared on the basis of functional capacity evaluation . . . whether the doctor has observed the Claimant in a work or work-like setting.  I have no idea why the doctor checks the boxes they check, because there are no indicating documents of who prepared . . . the interrogatories, even.  It says interrogatories of Michael Watson, M.D.  I have no idea who you even propose them or for what purposes they were proposed.

R., 364-65.

Larsen's counsel then explained that he asked Dr. Watson to review his files and to review the Social Security Administration Listing 1.02A for impaired ability to ambulate due to joint disease.  Larsen's counsel

continued:

> I sent him a copy of the -- doctors don't have Social Security's listing of impairments hanging around their office.  So I asked Watson to look at [Listing 1.02A] because I looked at the medical records that I had from Watson and Drapeza (sic) and Van Fleet and they're all talking about the guy's knees.  So I asked Watson to look at the listing and answer the interrogatories.  And here is, you know -- it's pretty straightforward.

R., 365.  The ALJ responded:

> Well, that's what you say but I don't know what was said to the doctor is my point.  I'm not doubting what you said.  I'm saying these documents appear in the file.

Id.  Larsen's counsel then stated that he would supply to the ALJ copies of his correspondence with the doctors.

Larsen then testified.  Larsen testified that he stopped working around April 2001.  He said he had scaled back his work over time prior to that time.  He used to provide maintenance services for several condominium buildings and also ran a lawn mowing business.  He testified that he gave up mowing four to five years before the hearing.  R., 380.  When he stopped working in April 2001, he was vacuuming the common area of one condominium building and emptying the trash from the condominium using a push cart.  R., 371-77, 382.  He said he did not perform any maintenance

inside the condominiums themselves except for opening up a sink or changing a light bulb.  <u>R.</u>, 383.

Larsen testified that he had severe pain in his back.  He stated that he wears out "real quick"  <u>R.</u>, 378.  He cannot stand or walk on hard surfaces without a great deal of pain.  <u>Id.</u>  Larsen testified that he takes Celebrex and Ultram for the pain.  He has been offered a pain patch, but has rejected it because he does not like the idea of taking such strong medicine.

Larsen said that during a typical day he prepares breakfast for his eldest son.  He then may perform a little bit of work around the house and then rest.  He said he lies down for much of the day.  He says that he vacuums, washes dishes, mops floors and does laundry.  He occasionally fixes a meal for the family.  He does not do grocery shopping unless his wife is out of town and the family needs something.  <u>R.</u>, 388.

He said he attends soccer, basketball, and baseball games in which his youngest son participates.  <u>R.</u>, 386.  He said that he takes his son to 30 baseball games a year, 30 to 40 soccer games a year, and approximately 10 basketball games a year.  <u>R.</u>, 386-87.  He drives his youngest son to practice and games approximately 4 to 5 times a week.  <u>R.</u>, 390.  He stated that he helps out with his son's basketball teams by giving a little advice, but he

does not coach.  He stated that he tries to stand during basketball games because he cannot sit in the hard chairs there.  He stated these games last approximately a half-hour to an hour.  He is able to sit in folding chairs during soccer and baseball games.  R., 392.  Larsen testified that after attending a sporting event, he is in severe pain for three or four days.  R., 396-97.

Larsen also testified that he goes fishing when it is warm out.  He goes with an 80 year-old friend to Lake Springfield, in Springfield, Illinois.  The two of them place an aluminum fishing boat into the water.  He estimates he typically fishes for four hours at a time.  He may go fishing several times a week during warm weather.  R., 392-93.

Larsen testified that he mows his yard.  He stated that it takes about half an hour.  R., 391.  At a later point in his testimony, he stated that he cannot mow the entire yard in one thirty minute period.  He said that he mows the yard in shorter segments of time.  He said he starts limping after ten minutes.  R., 399.  He also has fifteen bushes in his yard.  He testified that he can only trim one or two of them at a time.  R., 391.  He said he lies down after he finishes.  Larsen stated that he had difficulty walking on any hard surface for more than three or four minutes.  He said that he could

walk on carpeted surfaces for longer periods of time.  <u>R.</u>, 398-99.  He has a great deal of difficulty going up and down stairs and ramps.  <u>R.</u>, 399.  He testified that he can only carry about five to ten pounds.  <u>R.</u>, 401.  Larsen also explained that he and Dr. Watson were acquaintances because their sons played on the same soccer team.  He quit going to see Dr. Watson because his insurance changed and would not cover visits to Dr. Watson. <u>R.</u>, 403.

A vocational expert then testified at the hearing.  The ALJ asked the expert to assume an individual who is 49 years old with 15 years of education and the past relevant work of Larsen.  The ALJ asked the expert to assume an individual who is limited to light work subject to restrictions of no climbing or working at unprotected heights, no repetitive bending or stooping and no work which would require concentrated exposure to extreme cold.  <u>R.</u>, 405.  The expert gave examples of several light and sedentary jobs that this person could perform.  <u>Id.</u>

Larsen's wife, Cynthia Larsen, then testified.  She agreed that her husband stopped working in April 2001.  She testified that her husband used to work twelve hours a day, but slowly cut back because of the pain. She also testified that he has become more irritable and short-tempered.

She testified that cold weather really affects Larsen and makes his joints hurt more.  She testified they always stay at home except to attend a function for one of the children.  She said that they do not socialize anymore.  She testified that after Larsen goes to a function for one of his children, he must lie down for two or three days.  R., 416-20.

After the hearing, Larsen's counsel sent the ALJ copies of his correspondence to Drs. Watson and VanFleet.  The letter to Dr. Watson stated, in part:

> To aid the judge in making this decision, it would be very helpful to have some specific medical information. . . .
>
> One question that the Judge will decide is whether or not his condition meets or is medically equal in severity to the condition described at Listing 1.02, a copy of which I have enclosed for your review.  To ease the burden in preparing a narrative report, I have enclosed interrogatories.  Your answers can simply be legibly handwritten in the spaces provided, or they may be provided in the form of a narrative report in a letter.  I am also enclosing reports from other treating physicians, including orthopedist timothy (sic) Van Fleet, M.D. and internist Letty Drapiza, M.D.

R., 338.  The letter to Dr. VanFleet stated, in part, "Also enclosed is a Medical Source Statement.  Please advise us of the fee for completing this form."  R., 348.

The ALJ then contacted Dr. VanFleet to ask him about his assessment

12

of Larsen.   VanFleet responded by letter dated March 19, 2003.   Dr.

VanFleet stated that he based his assessment on:

> the patient's subjective report to me on what he thought he
> could withstand.   Certainly I would agree that a functional
> capacity evaluation would probably give us a more accurate and
> realistic portrayal of what the patient is able to tolerate.   Quite
> honestly the patient from a medical standpoint, has degenerative
> disc disease and as a result of this is limited not by a structural
> problem, but instead is limited by a subjective report of pain.
> Additionally I am not aware of Mr. Larsen's daily activities.   At
> this point in time I think the best course of action would be for
> him to undergo a functional capacity evaluation so that we
> could obtain a realistic idea of what his restrictions may in fact
> be.

R., 353.

On April 14, 2003, Larsen's counsel also submitted to the ALJ a

transcribed interview of Dr. Watson that was conducted after the hearing.

The interview was conducted much like a deposition; Dr. Watson was under

oath, and the interview was recorded by a court reporter.   The ALJ and

Larsen refer to the interview as a deposition.   Dr. Watson said that the x-ray

studies of Larsen's right knee showed a "complete collapse of the medial

compartment of his knees which basically means that all of the articular

cartilage or cushioning of the knee joint is completely gone to the point

where he is standing and bearing full weight he has bone to bone contact

without any cushioning." <u>R.</u>, 356.  Dr. Watson also said that Larsen walks with the limp and has a malalignment of his knees as a result of the arthritis.  Dr. Watson also stated that he has seen Larsen try to walk at sporting events.  Larsen's son and Dr. Watson's son play soccer together. Dr. Watson stated that he observed Larsen having great difficulty walking from his car to the athletic events.  Dr. Watson stated that Larsen has been unable to walk up and down bleachers.  He also stated that he observed Larsen having to sit frequently and being unable to remain in a standing position.  <u>R.</u>, 357.  Dr. Watson stated that his observations outside the office have only supported his clinical findings.  Dr. Watson also stated that the only surgical option was a complete knee replacement, but Larsen was too young for this type of surgery because the knee replacement would not last for Larsen's lifetime.  He stated that the goal would be to avoid surgery until a patient was in his mid-fifties at least.  <u>R.</u>, 358.

The ALJ then issued her Decision on July 14, 2003.  The ALJ followed the five step analysis set forth in the Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The listings of such severe impairments are set forth in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his residual functional capacity (RFC).   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Larsen met his burden of proof at Steps 1 and 2 of the Analysis because he does not engage in any substantial activity and has a severe impairment.  At Step 3 of the Analysis, the ALJ determined that Larsen's condition did not meet any Listing.  She spent two and one-half pages of her Decision reviewing Dr. Vincent's consultative psychological report in detail and analyzing whether Larsen meets the Listing for Affective Disorders.  R., 14-17.  She then wrote a two-sentence paragraph in which she concluded that Larsen did not meet any Listing for physical impairments.  She did not reference any objective medical test results or any statements by Larsen's treating physicians in this two-sentence statement. R., 17.

The ALJ then acknowledged that Larsen's counsel argued that Larsen met Listing 1.02A for the inability to ambulate due to joint dysfunction. She concluded that Larsen did not meet this Listing based on his testimony. She stated:

> Even if the clinical criteria of this listing are satisfied, functionally the claimant has not demonstrated an inability to ambulate effectively.  He admits to extensive daily activities that involve independent standing and walking (as discussed more fully below).  He attends sporting events including soccer games and baseball games and coaches basketball.  He does lawn work including walking behind a lawn mower (for ½ hour at a time)

16

and trims bushes, he fishes and puts his aluminum boat into the water, and otherwise walks and stands on a variety of surfaces including the uneven surfaces of a lawn, fishing area and sporting fields.  He does not use an assistive device for ambulation that would affect the use of his hands.  The claimant has not demonstrated that he meets or equals the latest or prior musculoskeletal listings.

<u>R.</u>, 18.  The ALJ did not address any of the objective medical evidence regarding Larsen's knee and back, and did not address the statements of his treating physicians, Drs. Watson, VanFleet, and Drapiza, when explaining her decision at Step 3 of the Analysis.

The ALJ then considered at Step 4 the Analysis whether Larsen retains the RFC to perform his past relevant work.  The ALJ found that Larsen had the RFC to perform light work.  She discounted his claims of pain.  The ALJ stated: "He alleges inability to stand, walk, or sit comfortably for any length of time, but nevertheless engages in extensive daily activities including household chores, yard work, coaching basketball, watching sports events, traveling out of town, and fishing for four hours at a time with an 80 year old friend."  <u>R.</u>, 19.  The ALJ then stated that:

> The objective medical evidence indicates mild to moderate joint problems; this is evidenced by daily activities, medical testing and the level of claimant's treatment/medication.  For example, "stronger" treatment/medications might be used for more than moderate pain such as a Morphine pump, etc.  He takes

17

> medication which apparently is effective and produces minimal
> side effects.  His exams have usually demonstrated full muscle
> strength, no muscle atrophy, no more than mild sensory loss,
> etc.

R., 19.  The ALJ then stated that Larsen's prior work was inconsistent with

his claims of pain:

> He worked at jobs that are at the medium exertion level until
> the alleged onset date; it is not logical (absent an acute event or
> other explanation) to be able to perform medium or light work
> (even on a part-time basis) one day, and to not be able to
> perform even sedentary work the next day.

Id.  The ALJ acknowledged the statements by Larsen's treating physicians,

but did not give them controlling weight.  The ALJ acknowledged that Dr.

Watson gave a statement "outlining more severe functional limitations

consistent with the claimant's allegations."  R., 20.  The ALJ further stated

that she "accepts this doctors (sic) conclusions regarding the claimant's

diagnoses," but stated that she did not give controlling weight to his

conclusions regarding the degree of Larsen's limitations because of his daily

activities.  She also discounted Dr. Watson's statement because it was done

in the form of a deposition but without the presence of any representative

of the Commissioner.  Id.

The ALJ acknowledged the statements of Dr. Drapiza that Larsen was

"almost physically incapacitated," but did not give the statement controlling weight because it lacks specific functional limitations and medical findings and was inconsistent with Larsen's daily activities. <u>Id.</u> The ALJ rejected the statements of Dr. VanFleet because Dr. VanFleet stated that his conclusions were based on Larsen's subjective statements and not on a functional capacity evaluation. <u>R.</u>, 21. The ALJ concluded that Larsen could perform light work subject to a restriction on prolonged walking, climbing, working at unprotected heights, concentrated exposure to extreme cold and repetitive bending, stooping or over-shoulder work. The ALJ further found that Larsen cannot crawl, kneel, or crouch. <u>R.</u>, 20. She determined that he could not perform his past relevant work. <u>R.</u>, 22.

The ALJ then proceeded to Step 5 of the Analysis. Based on the vocational expert's testimony, the ALJ found that Larsen could perform a significant number of jobs in the national economy. She therefore concluded that Larsen was not disabled. <u>R.</u>, 22-23. The Social Security Administration Appeals Council denied Larsen's request for review on September 17, 2004. <u>R.</u>, 6. He then filed this action.

ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the Decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  In considering the evidence, the ALJ must give controlling weight to the opinions of treating physicians if those opinions are expressed as a medical opinion of a treating source, the opinions are supported by medically acceptable clinical and diagnostic techniques, and the opinions are not inconsistent with other substantial evidence in the Record.  20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p.  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

In this case, the ALJ failed to articulate minimally her analysis of all

relevant evidence at Step 3 of the Analysis.  Three treating physicians, Dr. Watson, Dr. VanFleet, and Dr. Drapiza all stated that Larsen was severely disabled, and Dr. Watson specifically stated that Larsen met the requirements of Listing 1.02A.  The ALJ did not mention any of these physicians or their statements in her discussion at Step 3.  Rather, she spends two and a half pages talking about Dr. Vincent's consultative psychological examination and whether Larsen met the Listing for an affective mood disorder.  It is clear from that record that Larsen's primary impairments were physical, not affective mood disorder.  She should have addressed the treating physicians' statements about his back and knee impairments.  She did not.  She therefore failed to articulate her analysis of the relevant evidence at Step 3.

The ALJ's later discussion of the treating physicians' statements at Step 4 also does not adequately explain her analysis of this evidence.  Specifically, her analysis of Dr. Watson's statements is internally inconsistent.  The ALJ states that "[t]he objective medical evidence indicates mild to moderate joint problems," but later states that Dr. Watson gave a statement, "outlining more severe functional limitations consistent with the claimant's allegations," and that the ALJ, "accepts this doctors (sic)

conclusions regarding the claimant's diagnoses."  R., 13-14.  If the ALJ accepts Dr. Watson's diagnoses, then Larsen does not have mild to moderate joint problems, but, rather, a severe impairment of the right knee caused by a complete collapse of the medial compartment.  The ALJ fails to explain this inconsistency, and so fails to articulate minimally her analysis of this evidence.

The ALJ also failed to explain the degree to which her objections to the treating physicians' statements, made at the hearing, affected her decision. The Court also does not fully understand the nature of her objections.  She was concerned about the instructions given to the physicians.  That is a reasonable concern.  Larsen's counsel explained on the record at the hearing the instructions that he gave Drs. Watson and VanFleet.  The ALJ stated that she believed counsel, and apparently had no qualms about the instructions he gave, but stated that she still objected to the physicians' statements.  The counsel further sent the ALJ copies of his letters to Dr. Watson and VanFleet.  The letters show no improper instructions.  The record therefore does not adequately explain the basis for the ALJ's objections, and the Court is unsure of the degree to which the objections

affected her decision.[1]

The ALJ also objected to the transcribed interview of Dr. Watson because a representative of the Commissioner was not present.  The administrative process before the ALJ is not adversarial, and a statement under oath by a treating physician should be considered by the ALJ.  If the ALJ had questions, she could have contacted Dr. Watson as she did with Dr. VanFleet.  The ALJ does not adequately explain her objections to a claimant's effort to secure proof that comports with the requirements of the Commission's regulations.

The evidence also does not support the ALJ's findings at Step 4 of the Analysis.  The ALJ relied heavily on her findings regarding Larsen's daily activities as a basis for rejecting the statements of Larsen's treating physicians; however, some of the ALJ's statements about Larsen's activities are inconsistent with the evidence.  She states that he coaches basketball,

---

[1]The ALJ's comments could be read to indicate that if a claimant asks for statements from treating physicians, those statements are somehow tainted because the claimant asked for them.  The claimant has the burden of proof at the first four Steps of the Analysis.  The Social Security Regulations also state that the Commission gives controlling weight to a treating physician's statements on the nature and severity of an individual's impairments if those statements are supported by medically acceptable clinical and laboratory diagnostic techniques, and when those statements are not inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p.  It is wholly appropriate for the claimant to comply with the Commission's regulations and secure statements of treating physicians.

but the evidence does not support this statement.  Larsen said that he offered some advice to the basketball team, but did not coach basketball. She said that Larsen coached Dr. Watson's son.  The evidence does not support this statement.  Dr. Watson and Larsen stated that their sons played on the same soccer team, not the same basketball team.  There is no indication that Larsen even offered advice to his son's soccer team.  The ALJ stated that Larsen trims bushes; this statement needs some qualification since Larsen stated that he could only trim one or two bushes at a time.  She also stated that Larsen performed medium work the day before his onset date.  This is not supported by the evidence.  Larsen stated that he cut back on his work over time until, finally, just prior to his onset date, he vacuumed the common areas and took out trash using a push cart for one condominium.  He did not perform medium work immediately before his onset date.  Given the factual errors in the ALJ's analysis, the Court cannot conclude that substantial evidence supports her finding that Larsen's daily activities are inconsistent with the treating physicians' statements.  The Commissioner concedes that the ALJ's decision at Step 4 of the Analysis is not supported by substantial evidence.

The ALJ's decision at Step 5 of the Analysis is dependent on her

24

hypothetical questions to the vocational expert.  Those questions were dependent on her decision at Step 4.  Since the ALJ's decision at Step 4 is flawed, her hypothetical question to the vocational expert was flawed.  His opinion was therefore based on flawed assumptions and is not supported by substantial evidence.  The Commissioner also concedes this point.

Larsen asks the Court to remand with directions that the Commissioner find him to be disabled.  The Court can only do so if the evidence can yield but one supportable conclusion.  Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993).  At this point, the evidence is not so compelling.  The ALJ made errors that require reversal of this case, but the evidence could possibly support a conclusion that Larsen is not disabled. The statements of the treating physicians are to be given controlling weight unless they are inconsistent with substantial evidence in the record. Substantial evidence can include evidence of the individual's actual activities.  Social Security Ruling 96-2p.  Larsen's treating physicians stated that Larsen was disabled because he could not effectively ambulate. Larsen's activities  show some degree of ambulation.  Larsen testified that he attends 70 to 80 of his son's sporting events a year and goes fishing several times a week in the summer.  He also drives his son to practice

several times a week.  Much of these activities consist of riding in a car, but Larsen must also walk to some extent.  He also tries to stand during much of the approximately 10 youth basketball games that he attends because he cannot sit in the hard chairs in the gymnasium.  These games last half an hour to an hour.  He also mows grass; however, his testimony about mowing is somewhat confusing.  At one point, he said that he mows for thirty minutes at a time, but another time he stated that he could not complete the thirty minute mowing job all at once.  Overall, this evidence shows some ability to ambulate and may, possibly, be substantial evidence that is inconsistent with the statements of the treating physicians.  The Commissioner should make this factual determination.  The Court therefore will remand for further consideration.

Finally, Dr. VanFleet recommended a functional capacity test.  The ALJ refused to order such a test.  The Court directs the Commissioner to conduct the test at the Commission's expense in order to resolve any ambiguity between the treating physicians' statements and the evidence of Larsen's daily activities.  20 C.F.R. § 404.1519a(b)(4).

THEREFORE, Plaintiff Peter Larsen's Motion for Summary Judgment (d/e 14) is ALLOWED, in part, and Defendant Commissioner of Social

Security's Motion for Summary Affirmance of the ALJ's Step-Three Finding, and for Summary Reversal with Remand for Further Proceedings on the ALJ's Findings Thereafter (d/e 19) is DENIED.  The Court reverses and remands this matter pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion.  The Court denies Larsen's request that the Court direct the Commissioner to find that Larsen is disabled without further proceedings.   The Court also directs the Commissioner to conduct a functional capacity test of Larsen at the Commissioner's expense.  Finally, the Court requests that the Commissioner refer this matter on remand to a different Administrative Law Judge.

IT IS THEREFORE SO ORDERED.

ENTER:   October 18, 2005.

      FOR THE COURT:

             s/  Jeanne E. Scott
             JEANNE E. SCOTT
            UNITED STATES DISTRICT JUDGE